## UNITED STATES DISTRICT COURT DISTRICT
## SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GERALD GEORGE, CATHY DUNN, JEANETTE BURGHY, TIMOTHY STREFF, and ANDREW SWANSON, individually and as representatives of a class of similarly situated persons, | ) ) ) ) ) | Case No. 06-798-DRH |
| | ) | CLASS ACTION COMPLAINT |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | JURY TRIAL DEMANDED ON ALL |
| KRAFT FOODS GLOBAL, INC., KRAFT FOODS GLOBAL INC. ADMINISTRATIVE COMMITTEE, BENEFITS INVESTMENT COMMITTEE, and JIM DOLLIVE, KAREN MAY, MARC FIRESTONE, and PAMELA KING, all in their capacities as members of the Benefits Investment Committee, | ) ) ) ) ) ) ) ) ) ) ) ) ) | COUNTS AND ISSUES SO TRIABLE |
| Defendants. | ) | |

### COMPLAINT FOR BREACH OF FIDUCIARY DUTY

#### INTRODUCTION

1.     Personal savings accounts, such as 401(k)s, are quickly becoming employees' primary method of financially planning for retirement.  An increasing number of companies recently have announced the termination of traditional defined benefit pension plans and their replacement by defined contribution 401(k) plans.  For many employees in the United States today, an employer-provided defined benefit pension awaiting their retirement is a quaint, historical notion.

2.     In 401(k) plans, employers provide an opportunity for employees to save their own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment alternatives into which employees place a portion of their current income

with the hope of earning, over time, a return sufficient to support themselves and their families in retirement.

3.      Accordingly, in 401(k) plans, the return on employees' investments is critical.  Even seemingly small reductions in a participant's return in one year may substantially impair his or her accumulated savings at retirement.

4.      While such reductions in 401(k) accounts' returns may result from market fluctuations, a consistent, albeit rarely discussed, force reducing 401(k) accounts' earnings is the administrative fees and expenses assessed against account balances.

5.      The most certain means of increasing the return on employees' 401(k) savings is to reduce the fees and expenses employees pay from their 401(k) accounts.

6.      Unlike generalized market fluctuations, employers can control these fees and expenses.  Indeed, federal law requires them to do so.

7.      Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*. ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor."  The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping, investment management, and other services from entities in the financial and retirement industry.  ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit of Plan participants, and fully disclosed.

8.      For providing various services, third-party plan administrators, record-keepers, consultants, investment managers, and other vendors in the 401(k) industry have developed a variety of pricing and fee structures.

9.      At best, these fee structures are complicated and confusing when disclosed to Plan participants.  At worst, they are excessive, undisclosed, and illegal.

10.      In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and Class Representatives on behalf of the Kraft Foods Global Inc. Thrift Plan, Plan No. 125, (the "Plan") and similarly situated participants and beneficiaries in the Plan seek to recover the losses suffered by the Plan on a plan wide basis and to obtain injunctive and other equitable relief for the Plan from the Plan's fiduciaries based upon their breaches of their fiduciary duties.

11.      As set forth in detail below, the fees and expenses paid by the Plan, and thus borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants.  By subjecting the Plan and its participants to these excessive fees and expenses, and by other conduct set forth below, the Defendants violated their fiduciary obligations under ERISA.

## PARTIES, JURISIDCTION, AND VENUE

### Plaintiffs

12.      Plaintiff and Class Representative Gerald George is a resident of Rancho Cucamonga, California.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

13.     Plaintiff and Class Representative Cathy Dunn is a resident of Marion, Illinois, within the Southern District of Illinois.  She is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

14.     Plaintiff and Class Representative Jeanette Burghy is a resident of Madison, Wisconsin.  She is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

15.     Plaintiff and Class Representative Timothy Streff is a resident of Shawnee, Kansas.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

16.     Plaintiff and Class Representative Andrew Swanson is a resident of Columbia, Missouri.  He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7).

## Defendants

17.     Defendant Kraft Foods Global, Inc., formerly known as Kraft Foods North America Inc. ("Kraft") is a Delaware registered corporation with its headquarters in Northfield, Illinois.  It employs more than 94,000 people worldwide.  Kraft is the world's second largest food and beverage company, manufacturing and marketing many popular snacks and other food items.  It is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B), and is the employer and principal of the Plan's administrators.  It is a "named fiduciary" to the Plan within the meaning of ERISA § 402, 29 U.S.C. § 1102, and a fiduciary with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

18.     The Kraft Foods Global Inc. Administrative Committee ("Administrative Committee") has been delegated the authority and discretion to control the operation and administration of the Plan by the Management Committee.  It is thus a Plan administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).  It is also a fiduciary within the meaning of ERISA, § 3(21)(A), 29 U.S.C. § 1002(21)(A).

19.     The Benefits Investment Committee ("BIC") has the authority and discretion to control and manage the investment operations of the Plan.  Specifically, it has the authority and discretion to

> determine the advisability of establishing or modifying the description of any Investment Fund … made available under the Plan, to establish investment guidelines … to monitor the investment performance of each of the Investment Funds under the Plan and the fiduciaries responsible for the investment of Plan assets … and to coordinate with [other fiduciaries] on making available sufficient information to enable Participants, inactive Participants and beneficiaries to make informed investment decisions; and on performing any and all acts necessary to obtain the relief offered by section 404(c) of ERISA.

The BIC is a named fiduciary within the meaning of ERISA § 402, 29 U.S.C. § 1102, and is a Plan administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

20.     According to the documents describing the Plan, the Benefits Investment Committee has four members:  (1) Jim Dollive, the Executive Vice President and Chief Financial Officer; (2) Karen May, the Executive Vice President, Global Human Resources; (3) Marc Firestone, the Executive Vice President, Corporate & Legal Affairs and General Counsel, a newly created position believed to be the successor position to the duties of the position known as "Executive Vice President, General Counsel and

Corporate Secretary"; and (4) Pamela King, the current occupant of the position of Senior

Vice President and Controller.  As members of this committee, Mr. Dollive, Ms. May, Mr.

Firestone and Ms. King are fiduciaries to the Plan within the meaning of ERISA § 402,

29 U.S.C. § 1102, and ERISA§ 3(21)(A), 29 U.S.C. § 1002(21)(A), and are also Plan

administrators within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

## Jurisdiction and Venue

21.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29

U.S.C. § 1132(a)(2) & (3), which provide that participants may pursue civil actions on

behalf of the plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29

U.S.C. § 1109, and to obtain other appropriate equitable relief.  This Court has federal

question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C.

§1132(e)(1)(2).

22.     All Defendants are subject to service of process issued from this Court

pursuant to 29 U.S.C. § 1132(e)(1).

23.     Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2).  Kraft

has a facility located in Granite City, Illinois, within the Southern District of Illinois.  In

addition, Plaintiff and Class Representative Cathy Dunn resides in this district,

participated in the Plan from this district, received statements, Plan summaries, and other

information from the Defendants in this district and suffered damages in this district.

## The Plaintiff Class

24.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of

Civil Procedure, on behalf of themselves and all similarly situated Plan participants and

beneficiaries.  They seek to represent the following class (the "Class"):

All persons, *excluding the Defendants, the Committees and their members and/or other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

25.     Certification of this class is proper under Rule 23(a) because all of its prerequisites are satisfied:

    a.   **Numerosity.**  The members of the Class are so numerous that joinder of all members is impracticable.  Although the Plaintiffs do not know the exact number of class members as of the date of filing, there were 43,737 participants with account balances in the Plan at the end of the 2004 plan year.

    b.   **Commonality.**  Common issues of fact and law predominate over any issues unique to individual class members.  Issues that are common to all class members include, but are not limited to, whether the Defendants:

        i.   Charged fees and expenses to the Plan that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

        ii.   Caused the Plan to enter into agreements with third parties which caused and/or allowed the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

iii.   Failed to monitor the fees and expenses paid by the Plan
and, by such failure, caused or allowed the Plan to pay fees
and expenses that were, or are, unreasonable and/or not
incurred solely for the benefit of Plan participants;

iv.   Failed to inform themselves of, and understand, the various
methods by which vendors in the 401(k) retirement
industry collect payments and other revenues from 401(k)
plans;

v.   Failed to establish, implement, and follow procedures to
properly and prudently determine whether the fees and
expenses paid by the Plan were reasonable and incurred
solely for the benefit of Plan participants;

vi.   Failed properly to inform and/or disclose to Plan
participants the fees and expenses that are, or have been,
paid by the Plan;

vii.   Failed to inform and/or disclose to Plan participants in
proper detail and clarity the transaction fees and expenses
which affect participants' accounts balances in connection
with the purchase or sale of interests in investment
alternatives;

viii.  Breached their fiduciary duties by failing to disclose that
hidden and excessive fees were and are being assessed

against Plan assets and by failing to stop such hidden excessive fees;

ix.  Appointed as fiduciaries persons who did not fulfill their fiduciary duties, failed to monitor and/or oversee the performance of those fiduciaries and to ensure that they were fulfilling those duties, and failed to terminate the fiduciaries' appointment after breaches occurred;

x.  In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

xi.  Caused and/or allowed fees and expenses to be paid by the Plan for purposes other than those allowed by ERISA;

xii.  By the conduct above and/or by other conduct set forth in this Complaint, revealed in discovery and/or proven at trial, breached their fiduciary and other ERISA-imposed obligations to the Plan, Plan participants, and members of the Class;

xiii.  Are liable to the Plan and the Class for losses suffered as a result of the breaches of their fiduciary and other ERISA-imposed obligations; and

xiv.   Are responsible to account for the assets and transactions of the Plan and should be charged for any transactions and payments for which they cannot account.

c.   **Typicality.**  The Claims  brought by the Plaintiffs are typical of those of the absent class members because:

i.   The Defendants owed the exact same fiduciary and other ERISA-based obligations to each Plan participant and each member of the Class;

ii.   The Defendants' breach of those obligations constitutes a breach to each participant and each member of the Class;

iii.   To the extent that there are any differences among the Class members' damages, such differences would be a product of simple mathematics based upon their account balances in the Plan.  Such minimal and formulaic differences are no impediment to class certification.

d.   **Adequacy of Representation.**  The Plaintiffs are adequate representatives of the absent class members and will protect such absent class members' interests in this litigation.  The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the class claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

26.     Class certification is also appropriate under Rule 23(b) and each subpart because:

a.   Pursuant to Rule 23(b)(1)(B), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

b.   Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole;

c.   Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

### FACTS

### The Plan

27.     Kraft offers certain of its employees the opportunity to participate in the Plan, as part of their compensation and benefits  The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34) and contains an employee stock ownership plan provision.  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

28.     Kraft benefits from its sponsorship of the Plan because giving employees the opportunity to participate in the Plan enhances Kraft's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Kraft to tax advantages under the Internal Revenue Code.

29.     The Plan was established and is operated under a Plan Document.  The assets of the Plan are held in a single trust fund known as the Kraft Foods Global Inc. Master Defined Contribution Trust (the "Master Trust").

30.     Generally, a "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to a 401(k) plan or plans.  Plan sponsors and administrators generally utilize master trusts to administer multiple 401(k) plans for an employer or related-employer group (*e.g.* a company or related companies that maintain salaried and an hourly employee plans; plans formerly sponsored or administered by a company which the employer has acquired or with whom the employer has merged; plans which include only employees of a bargaining unit or represented by a labor organization, etc.).

31.     In this case, the Master Trust enables the Plan, along with two of Kraft's other 401(k) plans, to access common investment options and to share the services of the Master Trust record-keepers, investment managers, consultants, and other service providers.  The fees incurred for such services are allocated between the plans based upon each Plan's proportionate share of the assets in the Master Trust.  The Plan's assets comprise approximately 91% of the assets held in the Master Trust.

32.     Under the terms of the Plan, qualified employees may contribute certain portions of their before-tax and after-tax earnings to the Plan.  Kraft will match those contributions in varying percentages and may also make certain additional "qualified matching contributions."  Participants are at all times 100 percent vested in all portions of their account, except for Kraft's matching contributions portion.

33.     Each participant's account is credited with the participant's contributions, the participant's share of matching contributions, and the Plan's earnings.

34.     Participating employees may choose to invest Plan contributions in any of nine investment options, selected by Defendant BIC and its members, Defendants Dollive, May, Firestone and King or their predecessors on the BIC.

35.     The investment options are:  the Euro Equity Fund, the International Equity Fund, the U.S. Mid Cap/Small Cap Fund, the U.S. Large Equity Index Fund, the Balanced Fund, the U.S. Government Obligations Fund and the Interest Income Fund.

36.     The Plan also offers participants the option of investing in one of two single-stock funds.  The Altria Stock Fund is a fund that holds the common stock of Altria Group Inc., the parent corporation of Kraft.  This Fund formerly held the common stock of Philip Morris, Inc., Altria's predecessor.  The Kraft Foods Stock Fund holds Kraft's common stock.

37.     Nearly all of the fees and expenses incurred in administering the Plan and investing its assets are paid from the Plan's assets, whether from the Master Trust or directly from the Plan.  This means that ultimately the participants bear those costs.

38.     By the end of 2005, the Plan had over $5 billion in assets held in the Master Trust.  Of those assets, over $1 billion was in the Altria Stock Fund.

### Fiduciary Duties Owed To The Plan Under ERISA

39.     ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the **exclusive purposes of providing benefits** to participants in the plan and their beneficiaries **and defraying reasonable expenses of administering the plan.**

(Emphasis added).

40.     ERISA §§ 404(a)(1)(A)&(B) of  ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B), require that Plan fiduciaries, "shall discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries" and:

    a.  [F]or the exclusive purpose of:
        i.  providing benefits to participants and their beneficiaries; and
        ii.  defraying reasonable expenses of administering the plan; and
    b.  [W]ith the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

41.     ERISA § 405(a), 29 U.S.C. § 1105(a), provides that one fiduciary may be held liable for breaches of fiduciary duty committed by another fiduciary where

(1) the fiduciary "participates knowingly in or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach";
(2) the fiduciary, by his or her "failure to comply with section 1104(a) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary" enables "such other fiduciary to commit such a breach"; or
(3) the fiduciary "has knowledge of a breach by such other fiduciary," and does not make "reasonable efforts under the circumstances to remedy the breach."

42.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan and "parties in interest."  This section provides that unless subject to an exemption as set forth in ERISA § 408, 29 U.S.C. § 1108, a fiduciary

shall not cause the plan to engage in a transaction …if he knows or should know that such a transaction constitutes a direct or indirect – sale or exchange, or leasing, of any property between the plan and a party in interest …furnishing of goods, services or facilities between the plan and a party in interest …transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

43.     For purposes of section 406, a "party in interest" is any plan fiduciary, including the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a relative of any of the above, and certain persons with ownership or leadership roles in any of the above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

44.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own interest or for his own account"; (2) shall not "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan" or its participants and beneficiaries; and (3) shall not "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

45.     ERISA §104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator periodically provide to Plan participants and beneficiaries a summary plan description (an "SPD").

46.     ERISA §104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator at least annually provide to Plan participants and beneficiaries copies of statements and schedules from the Plan's annual report for the previous year, and such additional information "as is necessary to fairly summarize the latest annual report."

47.     The schedules and statements that the Plan Administrator annually must provide to Plan participants and beneficiaries specifically include:

a.  [A] statement of the assets and liabilities of the plan aggregated by categories and valued at their current value, and the same data displayed in comparative form for the end of the previous fiscal year of the plan; and
b.  [A] statement of receipts and disbursements during the preceding twelve-month period aggregated by general sources and applications.

*See* ERISA §103(b)(3), 29 U.S.C. §1023(b)(3).

15

48.     ERISA §104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and

beneficiaries to receive more detailed information from the Plan Administrator on request:

>  The administrator shall, upon written request of any participant or
>  beneficiary, furnish a copy of the latest updated summary, plan description,
>  and the latest annual report, any terminal report, the bargaining agreement,
>  trust agreement, contract, or other instruments under which the plan is
>  established or operated.

49.     ERISA §103(b)(2)&(3), 29 U.S.C. §1023(b)(2)&(3) mandates that, among

other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report"

>  a statement of [the Plan's] assets and liabilities, and a statement of
>  changes in net assets available for plan benefits which shall include details
>  of revenues and expenses and other changes aggregated by general source
>  and application.

50.     ERISA § 404(c) provides to Plan fiduciaries a "Safe Harbor" from liability

for losses that a participant suffers in his or her 401(k) accounts to the extent that the

participant exercises control over the assets in his or her 401(k) accounts.  To be eligible

for the protection of this "safe harbor," Plan fiduciaries must, among other things,

provide:

>  a.  an opportunity for a participant or beneficiary to exercise control over
>      assets in his individual account, and
>  b.  a participant or beneficiary an opportunity to choose, from a broad
>      range of investment alternatives, the manner in which some or all of
>      the assets in his account are invested.

29 C.F.R. §2550.404c-1(b)(1).

51.     For a participant or beneficiary to have "an opportunity to exercise control

over assets in his individual account," Plan fiduciaries must provide him or her with "the

opportunity to obtain sufficient information to make informed decisions with regard to

investment alternatives under the Plan."  29 C.F.R. §2550.404c-1(b)(2)(B).

52.     The "sufficient investment information" Plan fiduciaries must provide includes:

> A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees).

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(1)(v)*.  At least upon request, it must include

> A description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to participants and beneficiaries, and the aggregate amount of such expenses expressed as a percentage of average net assets of the designated investment alternative.

29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*.

53.     ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise control over his or her individual account so long as *Plan fiduciaries inform the participant* of such actual expenses:

> A plan may charge participants' and beneficiaries' accounts for the reasonable expenses of carrying out investment instructions, *provided that procedures are established under the plan to periodically inform such participants and beneficiaries of actual expenses incurred with respect to their respective individual accounts.*

29 C.F.R. §2550.404c-1(b)(2)(ii)(A) (emphasis added).

## The Fees and Expenses Assessed Against The Plan

54.     The Defendants, either directly or indirectly through the Master Trust, have caused the Plan to purchase services from various plan service providers, including trustee, record-keeping, administration, investment advisory, investment management, brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services.

55.     Either directly or through the Master Trust, the Defendants have caused the amounts that the Plan pays for these services to be assessed against participants' accounts.

56.     Payments in the form of direct disbursements from the Plan or the Master Trust to participants or an entity providing a service to the Plan are characterized as "Hard Dollar" payments.

57.     The Plan discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers.  For example, the Plan disclosed in filings with government regulators covering plan year 2004 that it paid Hewitt Associates $3,381,789 for record keeping services.

58.     ERISA provides that the fees and expenses incurred in administering and operating the Plan shall be "reasonable" and should only be used for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries.

59.     When all of the administrative and operational fees and expenses are taken into account, the participants and beneficiaries of the Plan paid unreasonably high fees for the administrative services they received.

## Investment Management and Other Fees Assessed Against Employer Stock Funds

60.     Employer stock funds or company stock funds ("Employer Stock Funds") are an investment option in many 401(k) plans, especially those of large employers with stock that is publicly traded on recognized stock exchanges.

61.     The Altria Stock Fund and the Kraft Foods Stock Fund, provide the participants in the Plan with the opportunity to use a portion of their 401(k) retirement

savings to purchase stock in the company for which they work or in their employer's parent corporation.

62.     By their nature, Employer Stock Funds, like the Altria Stock Fund and the Kraft Foods Stock Fund, are undiversified and risky, especially when they represent a disproportionately high percentage of a participant's retirement savings.

63.     While such Funds benefit employers by providing a steady market for the employer's stock and billions of dollars in working capital from their employees' salaries, Employer Stock Funds may cause 401(k) participants to embrace the risks inherent in undiversified investing.

64.     For the typical 401(k) participant, the risk that an undiversified Employer Stock Fund imposes is greater than that of other undiversified investments.

65.     The typical 401(k) participant, before placing any retirement savings in an Employer Stock Fund, relies on the stability and financial viability of his or her employer as the basis of his or her standard of living: the participant's present salary, healthcare and other benefits, as well as his or her pension (if any) and retirement health insurance depend upon the employer's continued solvency and viability.

66.     Thus, the same risk that could impair the participant's investment in the Employer Stock Fund – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-401(k) retirement benefits.  The risks are correlated and, if realized, would financially devastate most participants.

67.     Recent high-profile corporate scandals highlight the risks inherent in 401(k) participants' investment in Employer Stock Funds.

68.     Purportedly countering these concerns, Plan Sponsors and Administrators who establish and administer Employer Stock Funds, including those available through the Plan, suggest that employees' ownership of employer stock increases the employees' concern for the financial well-being of the employer, fosters a feeling of ownership of and identification with the employer, and enhances productivity.

69.     Regardless of the risks and benefits inherent in Employer Stock Funds, from a fee and expense standpoint, they *should be* a low cost investment alternative for participants in the employer's 401(k) plan.

70.     It is pivotal to participants' returns that Plan Sponsors and Administrators ensure there are no investment management expenses assessed against participants' savings in Employer Stock Funds and that if any administration fees are charged, they should be minimal.

71.     It is also important that the Employer Stock Fund does not hold cash of any significance on a continuous basis.

72.     Plan participants invest in Employer Stock Funds with the goal of sharing in their employer's financial success through the receipt of dividends and the increase in the value of the employer's stock.

73.     However, if an Employer Stock Fund's charges fees and expenses, and holds cash, as both the Altria Stock Fund and the Kraft Foods Stock Fund have done, it undermines the extent to which participants can do so.  This is especially true when the Employer Stock Fund's performance is compared to that of investors who purchase the employer's stock directly, instead of through the employer's 401(k) plan.

74.     Participants in the Plan who invest in either the Altria Stock Fund or the Kraft Foods Stock Fund do not own shares of Altria or Kraft Foods stock directly.  They own units of the respective Stock Fund.

75.     Each unit represents a portion of the shares of Altria or Kraft Foods stock in the Fund *and* a portion of the cash also held in the Fund, which can be as much as four percent.

76.     The value of the Stock Fund units are, and have been, reduced by the fees and expenses assessed against the assets in the Fund, and the returns are reduced by the cash – rather than the Altria or Kraft Foods stock – the Fund holds.

77.     As a result, the returns the Plan's participants receive on their investment in the Altria or Kraft Foods Stock Funds are, and have been, in general, lower than that of an investor holding a portfolio of pure Altria or Kraft Foods stock outside of the Plan.

78.     The amount of cash that the Altria Stock Fund or the Kraft Foods Stock Fund holds also reduces the extent to which participants share in their employer's financial success.

79.     If the value of Altria or Kraft Foods stock is rising – as Altria has been – or if the stock is paying dividends, participants who place their retirement savings in the Stock Funds naturally want *every* dollar they save to earn such investment gains.

80.     But the portion of the participant's savings that remains in cash, and is not used to purchase the employer's securities, does not generate such investment gains. Instead, its value remains essentially the same.

81.     For example, if a *non-401(k) investor* purchases 100 shares of Altria stock at $100 per share, and the share value thereafter rises by 10%, he or she has reaped a $1,000 gain on the initial $10,000 investment.

82.     However, a participant placing the same $10,000 in the Altria Stock Fund does not receive 100 shares of the employer stock.  He or she receives Altria Stock Fund units representing an interest in the shares of Altria stock held in the Fund *and* an interest in the Fund's cash.

83.     If the Altria Stock Fund held 4% cash and 96% employer stock, the 10% increase in the value of the stock would translate into a $960 gain, instead of the $1,000 earned by the non-Plan investor.  The value of the cash held in the Altria Stock Fund would remain essentially static.

84.     In this example to make matters worse, participants investing $10,000 in the Altria Stock Fund also will have to pay fees and expenses.  These fees and expenses will further reduce the participants' return.

85.     While this difference may seem modest, the Altria Stock Fund is one of the largest of all the investment options available to Plan participants, containing more than one billion participant dollars.

86.     Plan participants' returns in the Altria Stock Fund and Kraft Foods Stock Fund have substantially underperformed those of complete strangers to the Company investing outside of the Plan.

87.     The Defendants have failed, and continue to fail to disclose and explain to participants of the Plan that the return participants receive on employer stock in the Altria

Stock Fund and Kraft Foods Stock Fund is lower than that enjoyed by complete strangers to the company.

88.     The Defendants violated their fiduciary obligations under ERISA by maintaining and holding, by causing to be maintained or held, or by allowing to be maintained or held, excess cash in the Altria Stock Fund and Kraft Foods Stock Fund and by charging excessive fees and expenses and thereby impairing participants' returns.

### <u>Defendants' Non-Compliance with §404(c)'s Safe Harbor Requirements and Concealment of Their Fiduciary Breaches</u>

89.     As set forth above, Plan participants did not have, and do not have, complete and actual knowledge of the fees and expenses being charged to the Plan that reduced their account balances.

90.     For example, the Master Trust disclosed in filings with government regulators covering plan year 2004 that it paid a "contract administrator" $3,747,000 for record keeping services.

91.     This payment could be in addition to the monies paid directly by the Plan to Hewitt Associates during that year, or it could be a duplicative reporting of the same payment.

92.      At any rate,  the Plan fiduciaries, including the Defendants, have not told Plan participants, and Plan participants do not know:

    a.     the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and

    b.      the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

93.     As a result of the Defendants' failure and refusal to provide such information, and the general failure on the part of the Plan fiduciaries to disclose the actual Plan expenses, the participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives under the plan."  29 C.F.R. §2550.404c-1(b)(2)(1)(B).

94.     Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan and/or to have knowledge of, the Defendants' breaches of fiduciary duty.

95.     In fact, in their fiduciary roles, the Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

96.     Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

97.     Defendants' silence and/or non-disclosure in the face of such a duty to disclose is tantamount to an affirmative misrepresentation.

98.     Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

    a.     the total amount of fees and expenses reasonable and necessary to operate the plan;

b.     the total amount of amount of fees and expenses the Plan actually paid to service providers in the form of Hard Dollar payments;

c.     the true and accurate details regarding the revenues and expenses of the Plan;

d.     the true and accurate operating expenses which reduce participants' returns, for each of the Plan's investment alternatives;

e.     the true and accurate transaction fees and expenses which affect the participants' account in connection with the purchase or sale of investment alternatives;

f.     the amount by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

g.     other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

99.     Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404(c).

100.     Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

## COUNT I:
### Breach of Fiduciary Duty – ERISA §502(a)(2)

101.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 100 as though fully set forth here.

102.     As set forth in detail above, the Defendants owe the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

a.   To conduct themselves as Plan fiduciaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

b.   To perform their duties as fiduciaries with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

c.   To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

d.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

e.   To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

f. To ensure that the fees and expenses incurred by the Plan are reasonable and incurred for the sole and exclusive benefit of Plan participants and beneficiaries;

g. In entering into agreements with service providers to the Plan, to ensure that the payments from the Plan – whether they are direct or indirect – are reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

h. In operating and administering the Plan, to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

i. In operating and administering the Plan,  on an ongoing basis to monitor the payments made by the Plan to service providers – whether they are direct or indirect – are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

j. To inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

k. To inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and to remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

l.   To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

m.   To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments, and the fees and expenses incurred in connection with those investments;

n.   Upon request, to provide further any information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing  so; and

o.   To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions

p.   To appoint fiduciaries who lived up to their fiduciary duties, to monitor and oversee those fiduciaries in the performance of their duties, and to remove fiduciaries who breached their fiduciary duties.

103.   As set forth in detail above, the Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

a.   Causing the Plan to enter into agreements with service providers under which the Plan pays/paid – directly or indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

b. Allowing the Plan to pay – directly on indirectly – fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

c. Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

d. Failing to inform themselves of trends, developments, practices, and policies in the retirement, financial investment and securities industry which affect the Plan; and failing to  remain aware and knowledgeable of such trends, practices and policies on an ongoing basis;

e. Failing to inform themselves of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

f. Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

g. Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly and accurately;

h. Failing properly to inform and/or disclose to Plan participants the fees, costs and expenses that are, or have been, paid by the Plan;

i. Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees, costs and expenses which affect

29

participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

j.   Failing to discover, disclose and stop the charging of hidden and excessive fees and costs to the Plan;

k.   Failing to appoint fiduciaries who lived up to their fiduciary duties, failing to monitor and oversee those fiduciaries in the performance of their duties, and failing to remove fiduciaries who breached their fiduciary duties;

l.   By the foregoing conduct, failing to exercise the care, skill, prudence and diligence that a prudent person would when acting in like capacity and familiar with such matters.

104.     As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

105.     Further, as set forth in detail above, the Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c).  Accordingly, the Defendants are liable for participants and beneficiaries' investment losses in the Plan.

106.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), the Defendants are liable to restore to the Plan the losses it experienced as a direct result of the Defendants' breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

## <u>COUNT II:</u>
## Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)

107.     Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through 105 as though fully set forth here.

108.     As an alternative to the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

109.     Under section 502(a)(3), a participant may enjoin any act which violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

110.     Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

111.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

112.     Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from the Defendants, Plan participants and beneficiaries do not know, and have no means of knowing, how their assets have been managed and disbursed.

113.     Accordingly, the Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

114.     As set forth in detail above, the Defendants have caused and/or allowed the plan to pay – directly or indirectly – excess fees and expenses to Plan service providers.

115.     The Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

116.     Accordingly, the Court should order that the Defendants render an accounting of all transactions, disbursements and dispositions occurring in, in connection with, and/or in respect of, the Plan and its assets.

117.     The Plaintiffs respectfully request that the Court order that such an accounting include, without limitation, detailed and specific information regarding all fees and expenses incurred by the Plan and/or paid to third parties, whether paid directly by the Plan or indirectly transferred among Plan service providers or other third parties.

118.     Plaintiffs respectfully request that to the extent the Defendants do not or cannot account for all such transactions and their property under ERISA, the plan document and other applicable law, the Court surcharge against the Defendants and in favor of the Plan all amounts for which they cannot account.

119.     Plaintiffs further seek injunctive and other appropriate equitable relief to redress the wrongs described above, and to cause them to cease in order for the Plan's participants and beneficiaries to receive the full benefit of their retirement savings in the future.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- order the Defendants to make good to the Plan all losses that the Plan incurred as a result of the conduct described above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and/or cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- award actual damages to the Plan in the amount of its monetary losses;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and grant

    any other and further relief the Court deems appropriate

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL COUNTS SO TRIABLE.**

Dated:  October 16, 2006                    Respectfully submitted,


                                            **Schlichter, Bogard & Denton**

                                            ___/s/ Jerome J. Schlichter_____
                                            Jerome J. Schlichter
                                            Elizabeth J. Hubertz
                                            Heather Lea
                                            120 W. Main Street, Ste 208
                                            Belleville, IL  62220

                                            100 South Fourth Street
                                            Suite 900
                                            St. Louis, MO 63102
                                            Tel:     314-621-6115
                                            Fax:     314-621-7151
                                            jschlichter@uselaws.com
                                            ehubertz@uselaws.com
                                            hlea@uselaws.com
                                            Lead Counsel for Plaintiffs